**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-89 (EGS)** |
| **LEWIS EASTON CANTWELL,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Lewis Easton Cantwell to five months' incarceration, a term of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.     INTRODUCTION

Defendant Lewis Easton Cantwell participated in the January 6, 2021 attack on the United States Capitol building that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, including members of the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD"), and resulted in more than 2.7 million dollars' in losses.[1]  Cantwell contributed to and encouraged the violence and damage unleashed on January 6, 2021.

---

[1]  As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

After watching other rioters repeatedly assaulting law enforcement officers in the Lower West Terrance tunnel entrance to the Capitol—a scene that horrified people around the world—Cantwell chose to join in by urging rioters to get the doors to the building open, calling for "fresh patriots to the front," and participating in the mob rocking back and forth against the police officers who were trying to keep the mob from entering the U.S. Capitol.  He also joined in pushing a flagpole toward police officers who were trying to defend the building entrance.

The government recommends that the Court sentence Cantwell to five months' incarceration, which is within the advisory Guidelines range of 0-6 months that applies in this case and to which the parties stipulated in their plea agreement. A five-month custodial sentence is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553(a), particularly considering the gravity of Cantwell's crimes.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

As set forth in the Pre-Sentence Report ("PSR") (ECF 47) and the Statement of Offense

2

(ECF 44) incorporated into Cantwell's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber

until the session resumed.   *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 14-20.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds, as depicted in Government's **Exhibit 1**,[2] made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the USCP's defenses until the building itself was accessible and the occupants were at risk.   The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.

---

[2] All exhibits have been provided to the Court prior to sentencing.

4



**Exhibit 1[3]**

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's **Exhibit 1** as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down

---

[3] Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.

the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than one minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's **Exhibit 1**.   They flooded the area labeled "Lower West Plaza," Area C on Government's **Exhibit 1**, pushing against the barricade there.

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site, as depicted in Government's **Exhibits 2A-D and 3A-D**.



**Exhibit 2A**

**Exhibit 2B**

**Exhibit 2C**

**Exhibit 2D**[4]

---

[4] **Exhibits 2A-D** are stills from USCP security footage showing the progression of the crowd from the outer barricades (2A), to the first manned police barricade (2B), to engaging with USCP at the second manned police barricade (2C), and beginning to fill the Lower West Plaza (2D).



**Exhibit 3A**

**Exhibit 3B**

**Exhibit 3C**

**Exhibit 3D**[5]

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

---

[5] **Exhibits 3A-D** are stills from USCP security footage showing the breach of the West Plaza. The breach of the barricades (3A) was followed by the formation of a USCP officer wall (3B) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (3C).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (3D).

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage, as depicted in Government's **Exhibits 4A-C**.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



**Exhibit 4A**



**Exhibit 4B**



**Exhibit 4C**[6]

---

[6] **Exhibits 4A-C** show the breakthroughs in the defensive line on both the left and right flanks (4A) caused the entire police line to collapse and individual officers were swallowed by the

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.  *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day, as seen in Government's **Exhibit 5**.

---

crowd (4B) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (4C).



**Exhibit 5[7]**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of

doors was closed and locked, and members of Congress who had fled from the rioters were

sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers

from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the

doorway and guarding the entrance.   Many of these officers had already physically engaged with

the mob for over an hour, having reestablished a defense line here after retreating from an earlier

protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the

---

[7] Architect of the Capitol, available at: https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault

of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing

14

as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law."); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at*

https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol

Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous

weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement

officers.   *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers

and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol,

J. Brett Blanton, Statement before the House of Representatives Committee on House

Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-

05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect

of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S.

Capitol Building.   They caused extensive, and in some instances, incalculable, losses. This

included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems

and photography equipment, broken furniture, damaged artwork, including statues and murals,

historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and

Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar

Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb.

24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-

AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   As set

forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, to

date requiring the expenditure of more than 2.7 million dollars in losses.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

Cantwell traveled from North Carolina to Washington, D.C. to attend the "Stop the Steal" rally.   Thereafter, he went to the U.S. Capitol with hundreds of other individuals who participated in the riot.   On restricted grounds of the U.S. Capitol, while on the Lower West Terrace, Cantwell made it to the front of the tunnel entrance into the U.S. Capitol and used his cell phone to make several video recordings of individuals battling with law enforcement officers from the United States Capitol Police.   Cantwell yelled for the rioters to "get the door open," encouraging them to push against the police protecting the entry point into the building where Congress had met to certify the electoral vote.   At another point, Cantwell yelled that they needed "fresh patriots to the front."

At times, Cantwell can be seen participating in the mob rocking back and forth while chanting "heave ho" as they pushed against police.   He also helped propel a flagpole toward the Lower West Terrace tunnel, where a variety of objects were used to assault police.

### On the West Front of the Capitol

Cantwell recorded several videos while on restricted grounds of the U.S. Capitol on January 6, 2021.   In one video, estimated to be taken between 2:15 p.m. and 2:40 p.m.   Cantwell filmed himself as he said, "we've essentially stormed the Capitol building … we're tired of the bullshit."   Government's **Exhibit 6A**.   In another video from the same time and locations, Cantwell proclaimed, "liberty or death."   Government's **Exhibit 6B**.   Both videos were recorded by Cantwell on his phone and have been submitted to the Court.

### In the Lower West Terrace Tunnel

Cantwell arrived in the Lower West Terrace tunnel at 2:41 p.m., as seen in Government's

**Exhibit 9A.1**, a still taken from a Capitol security camera video; the video has been submitted to the Court as **Exhibit 9A**.



**Exhibit 9A.1** (still from Exhibit 9A)

The Lower West Terrace tunnel was the site of some of the worst assaults on police, as described above.   While Cantwell did not engage in any direct combat with police, he encouraged other rioters during his time in the tunnel.   During the battle, as police were trying to keep rioters from further breaching the shattered doors into the Capitol, Cantwell yelled out for "fresh patriots

18

to the front!"[8]   Government's **Exhibit 7.1**[9] is a still from video **Exhibit 7**.



**Exhibit 7.1** (still from Exhibit 7)

Cantwell filmed several videos on his phone of the brutality endured by the police.   *See*

---

[8] At timestamp 2:45 in **Exhibit 7**.

[9] In **Exhibit 7.1**, the severity of the fighting in the tunnel is captured in this photograph.   Duke Wilson (the individual with orange face in the blue CNN: Fake News hat to the right) pled guilty to violating 111(b) and was sentenced to 51 months of incarceration for his actions at this time and

Government's **Exhibits 8A – 8H**.   In one video, Cantwell filmed himself yelling for "fresh patriots to the front!"   Government's **Exhibit 8D**.[10]   In another video, Cantwell yelled for the rioters to "get the door open."   Government's **Exhibit 8H**.[11]   Cantwell filmed the mob rocking back and forth against the police guarding the Capitol while chanting, "Heave Ho!"   Government's **Exhibit 8G**.   This video, Cantwell himself filmed, depicted MPD Officer Daniel Hodges crying out[12] (still of Officer Hodges can be seen in Government's **Exhibit 8G.1**), while being crushed by the mob (as described above)[13]; and Cantwell proclaimed, "there's about a

---

place, including swinging a pole at the police line (21-CR-00345-RCL).   Devlyn Thompson (the individual in blue/green Seahawks fleece-lined cap in foreground) also pled guilty to violating 111(b) and was sentenced to 44 months of incarceration for beating an officer with a baton and throwing a box speaker at the police line (21-CR-00461-RCL).   Federico Klein (the individual in the red hat and green jacket facing away from this camera) is pending trial for violating 111(b) for pushing a police shield against the police line (21-cr-00236-TNM). The individual in the transparent construction-style hat on the right side of the photo has been identified by the FBI as a person on their "most wanted" list for assaulting federal officers.

[10] At timestamp 1:10 in **Exhibit 8D.**

[11] At timestamp 0:13-0:18 in **Exhibit 8H.**

[12] At timestamp 1:24 in **Exhibit 8G.**

[13] Patrick McCaughey and Steven Cappuccio are charged with violating 111(b) for the assault of Officer Hodges (21-cr-00040-TNM).

million people outside, these 45 cops are not going to hold everybody back."



**Exhibit 8G.1** (Still from Exhibit 8G with Officer Daniel Hodges circled)

In a video taken by another rioter, Cantwell can be heard saying, "our house" in response to the question, "whose house is this?"   Government's **Exhibit 10**.[14]   Cantwell remained inside the Lower West Terrace tunnel from his arrival at 2:40 p.m. until approximately 3:18 p.m., when police were able to push rioters out of the tunnel (albeit briefly).   Government's **Exhibits 9A-B**.

*Lower West Terrace*

After his actions within the tunnel, Cantwell remained on the restricted Capitol grounds for

---

[14]  At timestamp 5:40 of **Exhibit 10**.

21

approximately another hour and can be seen in open-source videos.   Cantwell did not leave the Lower West Terrace, even as other members of the mob tried to pull police officers into the crowd and used a variety of weapons on the police including MPD's own OC equipment.   Government's **Exhibit 11.1**, an excerpt from video **Exhibit 11**.[15]   In fact, he beckoned for other rioters to come closer to where the mob was engaging with police.[16]



**Exhibit 11.1** (Still from Exhibit 11)

---

[15]   **Exhibit 11** is an excerpt of an open-source video titled, "Political Trance."   The only modifications the government has made to the video is a yellow square around Cantwell to increase his visibility in the crowd.   Based on time-stamped recordings, the activity that took place as depicted in **Exhibit 11** occurred at approximately 3:59-4:02 p.m.   Todd Gardner is the individual in the leather jacket instructing others to "pull the cops out" at the beginning of the video.   Gardner is pending sentencing for violations of 111(b), 1512, and 231 (21-CR-622-APM).
[16]   At timestamp 0:40-0:45 in **Exhibit 11**.



**Exhibit 11.2**[17] (Still from Exhibit 11)

Several times, Cantwell also actively joined the mob in rocking against police officers

guarding the tunnel entrance to the Capitol.   As other rioters chanted "heave ho," Cantwell raised

---

[17] Ryan Nichols is the individual in the camouflage hat, yellow gloves, and the MK-46 spray canister.   Nichols is charged with violating 111(b), among other crimes and pending trial (21-CR-00117-TFH).

his fist in the air.   Government's **Exhibit 12**.[18]



**Exhibit 12.1** (still from Exhibit 12)

Cantwell can be seen participating in the "Heave Ho" rocking against the police protecting the

Lower West Terrace tunnel.[19]   also helped propel a flagpole into the tunnel[20] as other rioters

surged ahead and hit officers with other makeshift weapons.   Cantwell never attempts to extricate

---

[18] In   **Exhibit 12** Cantwell can be seen at timestamp 2:40-2:57 participating in the rocking back and forth against the police.   He can be seen at timestamp 2:52-2:57 raising his arm/fist in the air in a victorious manner.   **Exhibit 12** is a segment from an open-source video, title "FULL FOOTAGE: Patriots STORM the U.S. Capitol."   The only modifications the government has made to the video is a yellow square around Cantwell to increase his visibility in the crowd.   The video in its original form does not appear to be a continuous filming of events.   The entire video can be found at: https://www.youtube.com/watch?v=iNFcdpZdkh0&t=3509s
[19] At timestamp 4:05-4:45 of **Exhibit 12.**
[20] At timestamp 6:02-6:18 of **Exhibit 12.**

himself from the riot.



**Exhibit 12.2** (still from Exhibit 12)

In a video Cantwell took of himself at approximately 4:18 p.m., he said he was "officially fucked up," apparently referring to having been pepper sprayed, but it is not clear if he was motivated to leave at that point.   Government's **Exhibit 13**.

Although there is no evidence that he directly injured officers, Cantwell actively participated in a riot that injured officers and destroyed property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attach") *supra.*   Further, Cantwell's conduct and encouragement served to incite and embolden other violent rioters around him.

### *After the Riot*

After the unprecedented events at the U.S. Capitol, instead of showing remorse or contrition, Cantwell minimized the events and his participation.   When interviewed by the FBI, Cantwell claimed he went to the doors of the Capitol to "help" people.   In a post to his Facebook

page, Cantwell asserted he helped people and protesters; that there was no major property damage

done; and that he treated people with love and respect.   Government's **Exhibit 14**.   The videos

described above refute those claims.



**Exhibit 14**

## III.   THE CHARGES AND PLEA AGREEMENT

On February 5, 2021, a federal grand jury returned an indictment charging Cantwell with

Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) and 2; Obstruction of an Official Proceeding,

in violation of 18 U.S.C. § 1512(c)(2) and 2; Entering or Remaining in any Restricted Building or

Grounds, in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On March 24, 2022, Cantwell pled guilty to Count One, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) and 2.

## IV.    STATUTORY PENALTIES

Cantwell now faces sentencing for Civil Disorder.   As noted by the plea agreement and the U.S. Probation Office, Cantwell faces up to five years of imprisonment, a fine up to $250,000, and a term of supervised release.[21]

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

---

[21] The plea agreement erroneously states the term of supervised release is one year.   The PSR correctly states the Court may impose a term of supervised release up to three years.   *See*   PSR at ¶ 4.

The presentence report correctly calculates Cantwell's Guidelines range, which corresponds to the estimated Guidelines range in Cantwell's plea agreement.  The Guidelines calculation for Cantwell's offense of civil disorder under 18 U.S.C. § 231(a)(3) and (2) is as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | -2 |
| | Total Offense Level | 8 |

The U.S. Probation Office calculated Cantwell's criminal history as category I, which is not disputed. *See* PSR ¶ 47.  Accordingly, Cantwell's Guidelines imprisonment range is 0 to 6 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By

its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol grounds on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As a person entered the Capitol grounds, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at Cantwell's individual conduct, we must assess such conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Defendant Cantwell's crimes weigh towards a term of incarceration.   Cantwell was on restricted grounds of the Capitol for approximately two hours. While in the Lower West Terrace tunnel, he watched at close range the mob's violent clashes with

police.   Far from being a mere observer, he encouraged others to "get the doors open" and called for "fresh patriots to the front."   He took video of the violence against police officers, including video of Office Daniel Hughes crying out in pain while being crushed by the mob.

Even after being pushed from the tunnel, Cantwell remained on the Lower West Terrace for at least another hour at the forefront of the fighting.   While other members of the mob attacked officers with pepper spray, police shields, and other items, Cantwell participated in the mob's coordinated pushing rocking in unison against the police guarding the entrance to the Capitol.   He beckoned for others to come closer.   And as the crowd around him surged, he helped propel a flagpole into the tunnel toward police.

Defendant Cantwell's actions on January 6 show a disregard for the rule of law, a willingness to incite violence, and a callous disregard for the safety of uniformed law enforcement. The seriousness of this offense demands a sentence of imprisonment.

## B.  The History and Characteristics of the Defendant

Although Cantwell does not have any criminal history category points, he has a prior conviction for disorderly conduct,[22] as well as for multiple traffic violations,[23] and has not been completely compliant while on pretrial release;[24] therefore, demonstrating a disrespect for the law and this Court.   While the government acknowledges the extraordinarily difficult circumstances of Cantwell's upbringing described in the PSR, on January 6 he was a 35-year-old man capable of knowing right from wrong.   Cantwell served in the military,[25] and that experience should have

---

[22] *See* PSR ¶ 41.
[23] *See* PSR ¶ 43-54.
[24] On six occasions Cantwell failed to call to check in with pretrial services.   *See* PSR ¶ 13.
[25] Cantwell did go absent without leave ("AWOL").   *See* PSR ¶ 75.

instilled honor and esteem for law enforcement; instead, he actively encouraged others to fight

them and participated in the mob pushing against them.   Cantwell's conduct was not only wrong;

it was dangerous, and it was criminal.

    **C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack

on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6

showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[26] As with the nature and circumstances of the offense,

this factor supports a sentence of incarceration.   Cantwell's criminal conduct, encouraging the

mob and urging rioters to engage in conduct that resulted in the assault of law enforcement officers,

is the epitome of disrespect for the law. When Cantwell entered the Capitol grounds, it was

abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect

them, were under siege.   Law enforcement officers were overwhelmed, outnumbered, and in some

cases, in serious danger. The rule of law was not only disrespected; it was under attack that day.

A lesser sentence would suggest to the public, in general, and other rioters, specifically, that

obstructing, impeding, and interfering with law enforcement engaged in their performance of

official duties during a civil disorder is not taken seriously.   In this way, a lesser sentence could

encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient

sentence for a serious offense threatens to promote disrespect for the law").

---

[26] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[27] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.   As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

---

[27]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to deter Cantwell from future, similar criminal conduct  also weighs heavily in favor of a sentence at the top of the Guidelines ranges.   Although Cantwell has a criminal history category of I, his conduct on January 6, 2021, was egregious.   And in the aftermath of the attack, he did not express remorse for his actions but instead minimized his involvement.   He claimed on social media that he merely took videos and that he always treats people with love and respect, despite evidence showing that he was on the front lines of the attack on the Lower West Terrace and helped push a flagpole at police officers.   Cantwell's failure to acknowledge the wrongfulness of his actions demonstrates a need for specific deterrence.

*See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one."   *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

34

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"   *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.   As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.   This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.   In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.       Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Cantwell and others like him committed on January 6, 2021 are unprecedented.   Mechanical comparison to § 231 cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified, because these crimes defy comparison to other obstructive and assaultive conduct in other contexts.[28]

As of the date of this sentencing memorandum, several felony Capitol Riot defendants have been sentenced, but only a handful have been convicted and sentenced for a violation of 18 U.S.C. § 231(a)(3).   Unlike those other 231 defendants, Cantwell's criminal conduct took place in the Lower West Terrace tunnel, which is described above in detail and described by Sgt, Gonell as a medieval battle.

---

[28] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.   That table also shows that the requested sentence here would not result in an unwarranted sentencing disparity.

*United States v. Nolan Cooke*, 22-cr-52-RCL.   Cooke was convicted of a violation of Section 231 and sentenced to 12 months and a day incarceration.   Cooke was one of the first to breach the bike rack barriers on the east side of the Capitol; he physically pushed past officers; encouraged others to force their way into the building; and used his flagpole to strike at a window of the Capitol.   Because of his direct physical contact with law enforcement, Cooke's final offense level was 11, with a guideline range of 8-14 months.    Cantwell's conduct was similar to, but not as egregious as Cooke's actions on January 6.   For that reason, Cantwell's sentence should not be as severe as Cooke's sentence.

*United States v. Derrick Evans*, 21-cr-337-RCL.   Evans, like Cantwell, took several videos at the Capitol on January 6.    Evans did encourage others to enter the Capitol along with him at the Rotunda Doors, but unlike Cantwell he did not encourage others while officers were assaulted.   There, the United States requested 3 months' imprisonment, which is what the Court imposed for a violation of Section 231(a)(3).   Cantwell is distinguishable from Evans, because Cantwell encouraged people to join in the assault of police officers and he actively joined the mob of rioters rocking and pushing against the police and moving a flagpole into the tunnel, essentially participating in an assault.

*United States v. Daniel Johnson*, 21-cr-407-DLF. Daniel Johnson and his father, Daryl, entered the Capitol at the Columbus Doors and helped the mob in a group push against police, which resulted in doors to the Capitol being opened from the inside allowing other rioters into the building.   For Daniel Johnson, the government recommended a six-month sentence, and a 90-day sentence for Daryl Johnson.   Daniel Johnson's criminal history category was II, making his guideline range 4-10 months; Daryl Johnson's criminal history was I, making his guideline range

0-6 months, as Cantwell.   The Court imposed four-months incarceration for Daniel and 30 days incarceration for Daryl.   Cantwell's conduct is similar in that he participated in a group push against the police.   However, as noted, Cantwell's activity took place at the location where the most violent fight between the mob and the police occurred. Additionally, Cantwell encouraged others to join in the fight against the police, and he helped propel a flag further into the Lower West Terrace tunnel towards the police.

In *United States v. David Blair*, the government requested an eight-months term of imprisonment.   For showing up at the Capitol at approximately 5:50 p.m., yelling at police, and using a lacrosse stick to keep a police officer from removing him, the Court imposed a five-month sentence.

In *United States v. Andrew Griswold*, the government requested five-months' incarceration.   Griswold pushed his way into the Capitol at the Rotunda Doors and yelled "this is our house now!"   The Court imposed a 75-day sentence.

In *United States v. Moises Romero*, the court imposed a sentence of 12 months and a day for the defendant who took many videos, like Cantwell, of the chaos at the Capitol; entered the building once through the Senate Wing Door and a second time on the east side of the building; and grabbing the corner of a police officer's riot shield (which earned him a three-level guideline enhancement, making his range higher than Cantwell's).

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that

"different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[29] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[29] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cantwell must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Cantwell played in the riot on January 6.[30] Plea Agreement at ¶ 12.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.*   Cantwell's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 125.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of five months, a term of supervised release, $2,000 restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY*: /s/Jacqueline Schesnol*
JACQUELINE SCHESNOL
AZ Bar No. 016742
Trial Attorney
Capitol Riot Detailee
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, AZ 85004-4449
(602) 514-7500
jacqueline.schesnol@usdoj.gov

---

[30] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).