<pre>
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2


 3   UNITED STATES OF AMERICA,         .
                                       .  Case Number 21-cr-89
 4            Plaintiff,               .
                                       .
 5        vs.                          .
                                       .  Washington, D.C.
 6   LEWIS EASTON CANTWELL,            .  December 6, 2022
                                       .  1:33 p.m.
 7            Defendant.               .
     - - - - - - - - - - - - - - - -   .
 8


 9                    TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                     UNITED STATES DISTRICT JUDGE


11


12   APPEARANCES:

13   For the United States:      JACQUELINE SCHESNOL, AUSA
                                 United States Attorney's Office
14                               40 North Central Avenue
                                 Suite 1800
15                               Phoenix, Arizona 85004

16   For the Defendant:          NICOLAI COCIS, ESQ.
                                 Law Office of Nicolai Cocis
17                               25026 Las Brisas Road
                                 Murrieta, California 92562
18


19


20


21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284


24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
</pre>

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3              COURTROOM DEPUTY:  Criminal Case 21-089, the United

 4      States versus Lewis Easton Cantwell.

 5          Counsel, would you please identify yourself for the record,

 6      starting with the government.

 7              MS. SCHESNOL:  Good afternoon, Your Honor.  Jacqueline

 8      Schesnol, representing the United States.  Good to see you in

 9      person.

10              THE COURT:  All right.  Good afternoon.

11              MR. COCIS:  Good afternoon, Your Honor.  Nick Cocis on

12      behalf of Mr. Cantwell.  Mr. Cantwell is present, as the Court

13      can see, out of custody.

14              THE COURT:  All right.

15              PROBATION OFFICER:  Good afternoon, Your Honor.

16      Jessica Reichler on behalf of the United States Probation

17      Office.

18              THE COURT:  All right.  Good afternoon.

19          In speaking, you can take your mask off.  Otherwise, we

20      won't be able to get a record.  It's too difficult.  But if you

21      would keep it on otherwise, I would appreciate it.

22          I'm assuming a negative test?  Okay.

23          All right.  This case was reassigned to me from Judge

24      Sullivan.  Some of his cases were reassigned.  So I did not take

25      the original plea.  Mr. Cantwell pled to civil disorder, which
```

1    is a violation under 18 U.S.C. 231(a)(3) and (2), I believe.

2    Anyway, the maximum penalty, statutory penalty, is five years in

3    jail.  Maximum fine is $250,000.  He has agreed to pay $2,000 in

4    restitution.

5        In terms of his pretrial conditions, he is in compliance.

6    There have been periods when he had not been making phone calls,

7    but that has not been recent.  I have a presentence report.

8        I have government videos, they list about 15, with

9    different subparts; government's sentencing memorandum; a list

10   of cases and sentences in January 6 cases; the defendant's

11   sentencing memorandum; a report from Dr. Richard Romanoff, a

12   psychologist; 11 character references for the defendant; a

13   government's addendum to the sentencing memorandum and four

14   other videos; and the defense attorney also filed an additional

15   supplement, also with videos, based on my request about trying

16   to see whether there was any videos relating to a particular

17   event.

18       In terms of objections, none remain to be resolved.

19       The advisory sentencing guidelines, which are consistent

20   with the plea agreement, the base offense is 10.  He has a

21   reduction of two points for accepting responsibility.  The total

22   offense level is 8.  He has a criminal history of 0.  There are

23   no criminal convictions.  So he's in criminal history category

24   number I, offense level 8, criminal history category I.

25       In terms of custody, it's zero to six months.  Supervised

release is one to three years.  Probation is one to five years.

The fine range is 2,000 to 20,000.  Restitution that he has agreed to is 2,000, and there's also a special assessment of $100.

Since the presentence report is undisputed, I'm accepting all portions of the undisputed presentence report as findings of fact under Federal Rule of Criminal Procedure 32(i)(3)(A), and I will adopt the presentence report as written.

So I will now hear from the government, defense counsel, and the defendant, if he wishes to address the Court.  So I will let you present whatever you want.  I don't know whether you're doing videos or not.  You asked to come into the courtroom earlier.  So I wasn't sure.

MS. SCHESNOL:  Yes, Your Honor.  The government does have some videos it would like to play.  And as a matter of housekeeping, the government moves to admit Exhibits 1 through 19 into the record.

THE COURT:  Okay.  And these were the exhibits -- excuse me.  These were the exhibits that were on your list; is that correct?

MS. SCHESNOL:  That is correct, Your Honor.

THE COURT:  Any objections from defense counsel?

MR. COCIS:  No, Your Honor.

THE COURT:  I will go ahead and admit Government Exhibits 1 through 19, which are the videos, without objection.

1        (Government Exhibits 1 through 19 admitted into evidence.)

2        MS. SCHESNOL:  Thank you.

3        Democracy is fragile, and it requires that all citizens

4   appreciate it.  I'm quoting Your Honor from the sentencing of

5   Jerry Ryals in Case 21-cr-244, which was held before Your Honor

6   about five weeks ago.

7        On January 6, 2021, as brave members of the Capitol Police

8   and Metropolitan Police Departments and other assisting

9   departments protected the Capitol really just steps from where

10  we sit today, they were protecting the Capitol.  Mr. Cantwell,

11  however, was not.  He was on restricted grounds, and while

12  there, already surrounded by thousands of rioters, he took a

13  video of himself, which is Exhibit 6A, in which he said, "We've

14  essentially stormed the Capitol.  We're tired of this" BS, but

15  he says the whole word.

16        (Video played.)

17        MS. SCHESNOL:  Mr. Cantwell didn't turn and leave.  He

18  stayed.

19        And in another video, Exhibit 6B, he says, "There are too

20  many of us."

21        (Video played.)

22        MS. SCHESNOL:  So Mr. Cantwell was not deterred by the

23  thousands of rioters who had formed a mob on the Capitol.

24  Instead of leaving, he moves closer to the building.  And as

25  police began their hand-to-hand combat with rioters on the west

1    front of the Capitol, Mr. Cantwell worked his way through those

2    thousands of people to get as close to the building as possible

3    to what we've been calling the Lower West Terrace tunnel, the

4    very center of the west front of the Capitol building and what

5    has been described by the officers who protected that area of

6    the Capitol, a "medieval battle ensued."

7         While some people left that area, Mr. Cantwell stayed and

8    moved even closer.  This is Exhibit 9A.  This has no sound.

9    This is from Capitol CCTV, which has a date and time stamp.  You

10   can see it's 2:41 in the afternoon.  Again, there's no audio

11   with any of the CCTV.

12        (Video played.)

13        MS. SCHESNOL:  And I've done my best to circle -- or

14   to square Mr. Cantwell in yellow so that you can see him.

15        But what I want to point out to the Court is not only is

16   Mr. Cantwell moving his way closer, as he moves closer to the

17   Capitol, closer to the camera, that's actually the double doors

18   into the Capitol at the very center of the west front.  And you

19   can see, some of the other people in the mob actually are

20   turning and walking away, but not Mr. Cantwell.  He gets right

21   in there, right to the very doors where this medieval battle

22   takes place.

23        (Video played.)

24        MS. SCHESNOL:  And then as Your Honor can see, the

25   police are already fighting.  There's police on the other side of

1    those glass doors.  Mr. Cantwell doesn't turn and leave.  And at

2    approximately 2:45 into the video, not in the afternoon but into

3    the exhibit, you will hear a call for "fresh patriots to the

4    front."

5         I will play that again.  "Fresh patriots to the front," as

6    he is beckoning with a hand motion.

7         And the reason I'm taking up the Court's time with all of

8    this, and I have no doubt Your Honor watched the videos that

9    we've submitted, is because in Mr. Cantwell's Facebook post after

10   the riot, which is Exhibit 14, in his sentencing memo, he really

11   tries to minimize his conduct, and I want it fresh in Your

12   Honor's mind what the defendant was really doing that day, and

13   that he was not there to help people and he was not there simply

14   to record historic events.

15        This is Exhibit 8D, and again, I'm not going to play every

16   exhibit, because I have no doubt Your Honor has watched all of

17   them.  I'm just highlighting some.  In Exhibit 8D at

18   approximately 1:10 time stamp into the video.

19        (Video played.)

20        MS. SCHESNOL:  I will just pause it there.

21        About ten seconds in, you can see the fighting that's going

22   on.  You can see the battle.  Again, if Mr. Cantwell tries to

23   paint himself as someone who is there to assist or merely record

24   events, that is simply belied by these videos.  And thank

25   goodness for the videos, some of which Mr. Cantwell took

himself.  So you can see the fighting and the chaos that is
going on.

(Video played.)

MS. SCHESNOL:  And I'll fast forward to about 2:45
time stamp into the video, where Mr. Cantwell again calls for
fresh patriots to the front.  I'm sorry, 1:00.  I apologize.

(Video played.)

MS. SCHESNOL:  That is not the action of someone
simply recording historic events.  That is not the action of
someone who is there to assist.

As the police continued to shield the building that housed
our lawmakers and their staff, Mr. Cantwell continued to film
himself, videos on his own phone in the Exhibit 8 series.  He
yelled to "keep pushing," to "get the doors open," and "we need
people up here."  This is in Exhibit 8H, between approximately
13 and 18 seconds of the video.

(Video played.)

MS. SCHESNOL:  That's Mr. Cantwell's post on his own
social media page.  It's his hand, his gloved hand that you see
pointing saying, "Get the door open.  Keep pushing and get the
door open."

(Video played.)

MS. SCHESNOL:  So this gloved hand that you can see --
I'm not sure if we're in a touch screen mode.  Right there,
that's Mr. Cantwell's hand.  So you can see him pushing -- I'm

1      sorry.  You can see his hand --

2              THE COURT:  You need to speak in the microphone.

3              MS. SCHESNOL:  You can see his hand on that video, and

4      when you listen closely, you can hear him saying "keep pushing"

5      and "get the doors open."

6          I will play it again.

7          (Video played.)

8              MS. SCHESNOL:  Again, this is the door into the very

9      center of the Capitol building, where you can see law

10     enforcement are trying to hold that door.  And Exhibit 15 is an

11     explanation from Officer Kyle Ramey -- I think I diminished his

12     rank; he's higher than an officer -- that described the events

13     in this Lower West Terrace tunnel and all the fighting and

14     everything that law enforcement did to protect that door,

15     because they knew, law enforcement knew that if they lost that

16     door at the very center, that these thousands of people on the

17     west front of the Capitol could flood right into the Capitol

18     building.

19         As the day wore on, the police, who were already vastly

20     outnumbered by rioters and being crushed in the Lower West

21     Terrace tunnel, Mr. Cantwell didn't help the police.  He

22     continued to film.  And you can see in Exhibit 8G, he's

23     continuing to film.

24             (Video played.)

25             MS. SCHESNOL:  Mr. Cantwell isn't calling for help.

He is not telling rioters to stop.  So any assertion that he

makes that he was there to help the police or document events is

simply not true.  And at 1:24 into this video, you can see

Officer Hodges, who has become quite well known for being

crushed in these doors, right at the Lower West Terrace tunnel.

(Video played.)

MS. SCHESNOL:  This is Officer Hodges -- I'm going to

circle him in blue -- who is crying out for help as the mob is

attacking the police, attacking the Capitol.  And remember,

Mr. Cantwell has already called to get the doors open and fresh

patriots to the front.

In this same Exhibit 8G at approximately 3:30, Mr. Cantwell

says, "There's about a million people outside.  These 45 cops

are not going to hold everyone back."

(Video played.)

MS. SCHESNOL:  As the police guarded the very building

that represents our freedom, Mr. Cantwell is still in the heart

of this medieval battle.  And from a video taken from another

rioter, which is Exhibit 10, and the other rioter is

saying, "This is our house, this is our house," Mr. Cantwell is

also chanting, "Our house."

(Video played.)

MS. SCHESNOL:  I'm going to fast forward this to

approximately five minutes into Exhibit 10.

(Video played.)

1             MS. SCHESNOL:   This is Mr. Cantwell right here.

2        (Video played.)

3             MS. SCHESNOL:   This is Mr. Cantwell screaming, "Our

4   house."  Again, thank goodness for video, because otherwise,

5   Mr. Cantwell would stand here today as he has before and

6   represent that he's merely recording historic documents --

7   historic event and trying to assist people who were there.

8        And the government submits to you that is not at all what

9   Mr. Cantwell was doing.  Mr. Cantwell stayed in this Lower West

10  Terrace tunnel from approximately 2:41 to just about 3:18, when

11  law enforcement made a big push of the rioters out of the tunnel

12  area, out onto the Lower West Terrace plaza.  It is

13  approximately at that point in this big push when both Officer

14  Fanone from the MPD and a Capitol Police officer who we are

15  identifying with his initials M.M. were also pushed and/or

16  dragged out.  And we will circle back to whether or not

17  Mr. Cantwell actually helped those officers.

18       But I want to go through with Your Honor the rest of

19  Mr. Cantwell's activity and behavior on the Lower West Terrace

20  on January 6.

21       So Mr. Cantwell remains on the Lower West Terrace for

22  approximately another hour, because we too have a video of him

23  at 4:18 still on Capitol grounds.  It is unclear at what point

24  he left.  But we know that after getting pushed out of the

25  tunnel, he is still on the grounds for at least another hour.

1          Turning to Exhibit 11, this is an open source video that

2    was taken at approximately 4:00 p.m.  And in this video, you can

3    see Mr. Cantwell waving other rioters to come closer to the

4    building.  I apologize.  Exhibit 11.  I pressed the wrong one.

5          (Video played.)

6          MS. SCHESNOL:  I want to pause it right here, because

7    I want to set the full context of, before Mr. Cantwell waves

8    people to come closer, you hear a rioter distinctly calling,

9    "Pull them out.  Pull the cops out.  Grab them by their arms and

10   pull them out."  After hearing that, presumably at least being

11   within earshot, again, Mr. Cantwell doesn't say, "This is not

12   what I signed up for.  I was just here to document these

13   historic events."  No, after that, he is beckoning people

14   closer.

15         (Video played.)

16         THE COURT:  This, I take it, is outside the tunnel

17   area?

18         MS. SCHESNOL:  This is just outside the threshold to

19   the tunnel, but right at that sort of mouth.  So as I'm sure

20   Your Honor has seen, because this isn't your first case, on that

21   Lower West Terrace, it's an extended platform that had been set

22   up for the inauguration, and then what we've been calling the

23   tunnel, it's this archway that's about 15 feet deep or so and

24   then those two sets of brass and glass doors.

25         But yes, this is taking place just feet from the threshold

1    of the tunnel.

2         THE COURT:  So according to you, is this before he

3    went into the tunnel or afterwards?

4         MS. SCHESNOL:  This is afterwards.  This is at

5    approximately 4:00 p.m.  The reason I can assert that to the

6    Court with some certainty is because this individual yelling to

7    pull the police out is actually a defendant that I am

8    prosecuting, and I have spent a lot of time with his videos and

9    matching them up to time-stamped videos.  So this is occurring

10   in this sort of 3:58 to 4:02 period.

11        And this is important because this is not only after

12   Mr. Cantwell gets pushed out of the tunnel but remains in that

13   general area; this is also well after the time period where

14   Officer Fanone and Officer M.M. were outside.

15        And so again, we will circle back to whether or not

16   Mr. Cantwell really assisted any law enforcement, but the

17   government would assert that whether he did or not, after that,

18   after seeing what happened -- let's say he did assist a police

19   officer, which we are not agreeing to, but if Mr. Cantwell

20   assisted police officers, then later, 30 to 40 minutes later,

21   when someone's yelling "pull them out, grab the cops and pull

22   them out," Mr. Cantwell is beckoning other rioters to come

23   closer, which again sort of flies in the face of whether or not

24   he really helped law enforcement.  But even if he helped them 40

25   minutes earlier, he was doing nothing to help them as he was

1    beckoning other rioters closer, which we will see at

2    approximately 40 seconds into this video.

3            (Video played.)

4            MS. SCHESNOL:  There, you can see the archway to the

5    tunnel.  So to answer Your Honor's question, you can see how

6    close they are to the mouth of the tunnel.

7            (Video played.)

8            MS. SCHESNOL:  This is Mr. Cantwell with the yellow

9    square around him.  You can recognize him by the baseball hat

10   he's wearing.

11           (Video played.)

12           MS. SCHESNOL:  Here he is, arm in the air calling to

13   the crowd, beckoning others to come closer while other rioters

14   are yelling "grab them by the arms and pull them out" just feet

15   from him.  You can see him turning, looking at the crowd, and

16   beckoning people to come closer.

17           (Video played.)

18           MS. SCHESNOL:  And I know it sounds like I'm beating a

19   dead horse, but number 1, thank goodness for video.  And

20   number 2, this belies any assertion that Mr. Cantwell was merely

21   filming historic events.  He is urging other rioters to come

22   closer to where the police are being assaulted, to where he

23   claims he helped police 30 to 40 minutes earlier.

24           And then in Exhibit 12 -- Exhibit 12 is an open source

25   video.  From watching it multiple times, it does not appear to

1    be one continuous video.  It's sort of choppy and starting and

2    stopping because it was not filmed from a stable camera at the

3    Capitol.  It is basically a rioter's open source video.  But

4    this is Exhibit 12, and we're first going to watch at around the

5    2:40 mark.  You can still see Mr. Cantwell on the terrace, and

6    we're going to jump to approximately 2:40 in this video.

7         (Video played.)

8         MS. SCHESNOL:  So I want to describe to Your Honor

9    what's happening here.  On more than one occasion on this Lower

10   West Terrace just outside the archway of the tunnel, rioters

11   collectively on more than one occasion rocked back and forth,

12   and some of them chanted, "Heave ho, heave ho."  The police are

13   just inside that tunnel.  So that is what they are rocking and

14   chanting "heave ho," again as though they're storming the castle

15   in some medieval battle.

16        And as you watch this portion of Exhibit 12, you can see

17   that Mr. Cantwell is taking part in that rocking motion.  At

18   some parts, you can even see the strain on his face that

19   demonstrates that he is exerting effort in that push.  And at a

20   point, he even raises his fist in the air in what I submit to

21   you is a sort of sign of -- a victorious sign of achievement.

22        (Video played.)

23        MS. SCHESNOL:  I don't know if Your Honor just saw

24   that.  Mr. Cantwell's fist is in the air right here at 2:52.

25   And leading up to that, he is taking part in this rocking

1    motion, of this heave ho.

2        (Video played.)

3            MS. SCHESNOL:  Again, 2:40.

4        (Video played.)

5            MS. SCHESNOL:  Mr. Cantwell raises his fist in what I

6    submit to you is a show of victory.

7        (Video played.)

8            MS. SCHESNOL:  Then at approximately four minutes into

9    this same exhibit video, 12, Mr. Cantwell continues to

10   participate in this heave ho rocking motion against the police

11   who are inside the tunnel.

12       (Video played.)

13           MS. SCHESNOL:  So Your Honor was able to see there

14   that heave ho rocking and chanting motion that I have described

15   for you.  And again, Mr. Cantwell is right in the thick of it.

16           THE COURT:  So I take it the original, the earlier

17   videos show him going in and, then he's in the tunnel area.  The

18   police push everybody out.  And then these are efforts to go

19   back in.

20           MS. SCHESNOL:  That's exactly right, Your Honor.  In

21   anticipation that you might ask about the timeline, to the best

22   of my ability -- and I would say I think it's fairly accurate; I

23   have spent many hours watching many videos -- it appears

24   Mr. Cantwell arrives on the grounds of the Capitol somewhere

25   between 2:15 and 2:40.  So those earlier videos that we looked

1      at, Exhibits 6A and 6B, where he's talking about all the people

2      there and, you know, we've essentially stormed the Capitol,

3      we're tired of this BS, too many of us, that takes place some

4      time between 2:15 and 2:40.  That's hard to nail down that time

5      period.  2:41 is when Mr. Cantwell enters the tunnel from the

6      CCTV video.  We also know the police push people out of the

7      tunnel right around 3:18, that Officer Fanone and Officer M.M.

8      are assaulted somewhere in the 3:18 to 3:21 time period.

9           And then these videos that we've been watching, Exhibits 11

10     and 12, are taking place in the 4:00 p.m. to 4:20 time period

11     and, again, definitely after Officer Fanone and Officer M.M.

12     were out in the crowd.

13          So I'm going to clear the screen.

14          Also in Exhibit 12, at approximately six minutes into the

15     video, you will see that a flag pole is ushered into the tunnel.

16     Many weapons were used against the police -- flag poles.

17     Because it was a construction zone for the inauguration, there

18     were all sorts of tools that were used.  MPD's own OC canisters

19     were not only deployed but then thrown and used against them.

20     So, many, many objects were used against the police.  And in

21     this -- at this point in the video, at about six minutes, we can

22     see that Mr. Cantwell helps propel a flag pole into the tunnel.

23          (Video played.)

24            MS. SCHESNOL:  Here, you can see the flag pole being

25     ushered in towards the police.  And I don't know what

Mr. Cantwell will say, but in the event he tries to stand before

you and tell you "we were just trying to get the flag pole in

there so it couldn't be used as a weapon" -- I don't know if he

will say that, but there's no way that's what's going on.  You

can see rioters climbing into the tunnel to assault police.  So

the people there were not assisting.  This flag pole was not

being ushered in as some way to get it out of the crowd.  This

is one of the many weapons that were being projected and moved

towards the police.

     What Mr. Cantwell did was encourage other rioters, incited

other rioters, and emboldened other rioters to be able to

violently assault the police.  The officers who were in this

Lower West Terrace tunnel have described the attack as nothing

short of brutal.  Many officers were injured, bleeding,

fatigued, and they continued to hold the line.

     The government put forth in its sentencing memorandum

congressional testimony from Officers Gonell, Fanone, Dunn, and

Hodges where they describe what they went through.  And a point

that I would like to make, those four officers not only showed

extraordinary bravery on January 6th, but the fact that they

continue to speak out shows such heroism.  And I understand why

other officers don't come forward, because these four officers

have suffered such harassment, but I think it leaves a lot of

people in the public with the impression that maybe only four

officers were hurt that day or maybe only a handful of officers

1    were affected that day, whether physically or emotionally, and

2    that's simply not the case.  Hundreds and hundreds of officers

3    who fought to protect the Capitol that day were injured both

4    physically as well as emotionally.

5        In interviewing officers, not for this case but in other

6    cases that I'm preparing for trial, I have had more than one

7    officer who has been on the force years, if not decades, cry in

8    my office over what they went through.  So lest anyone think

9    that only four officers were affected, that is not the case.

10       And when Mr. Cantwell is encouraging other rioters to come

11   forward, to heave ho, to push fresh patriots to the front and

12   get the doors open, all those officers who were there that day

13   were affected.

14       One officer I spoke to who is a victim in a trial that I'm

15   doing later this month, I asked him -- he's 55 years old,

16   25-year veteran, fought for hours on the west front, was

17   victimized over and over.  And I asked him, "How did you do it?

18   I mean, physically, how did you physically fight for hours and

19   hours?  How did you have the stamina?"  And he said, "What

20   choice did we have?"

21       That's what the officers went through that Mr. Cantwell was

22   encouraging other rioters to come forward, the other rioters who

23   assaulted police.

24       We're dealing with a crime today that even if Mr. Cantwell

25   didn't personally put hands on a police officer, he engaged in

1    that rocking motion back and forth for that heave ho, and he

2    encouraged other people to come forward.  A crime of this

3    magnitude demands an equally serious sentence, and the

4    government believes that the sentence it has recommended of five

5    months' imprisonment adequately reflects the 3553(a) factors for

6    this serious offense.

7        Mr. Cantwell participated in an insurrection.  The 3553(a)

8    factors, the nature of the offense, the events of January 6 are

9    unprecedented, barely imaginable, the likes of which we'd expect

10   to see in some third world banana republic.  As most of us

11   watched our TVs in dismay, horrified what was going on and even

12   more horrified when we ultimately learned of all the brutality

13   that took place that day, what the police endured, what members

14   of Congress and the staff endured, we watched in horror,

15   Mr. Cantwell was right in the middle of that.  He was in the

16   thick of it all, working his way closer and closer to the

17   Capitol, agitating others to engage in violence.  Other rioters

18   attacked the police from all sides, and every time the defendant

19   encouraged others to attack the police, it made it harder for

20   the police to defend themselves.

21       Again, one officer, as referenced in the government's

22   sentencing memo, Officer Gonell, said the officers were

23   subjected to a medieval battle fighting hand to hand, inch to

24   inch to prevent invasion of the Capitol.  And even though

25   Mr. Cantwell didn't go inside the Capitol, his conduct on the

Lower West Terrace tunnel, on the terrace and in the tunnel
deprived the officers who were protecting the Capitol at the
tunnel from going elsewhere to stop the other rioters who had
already breached the Capitol and were already inside, for those
who were on the Senate Floor and in Speaker Pelosi's office.

Because of the defendant's actions that day, the members of
the United States Congress were forced to flee their chambers.
The mob's objective was to stop the constitutional and statutory
duty to declare the person who was elected president.  The
gravity of this offense should be met with a five-year --
five-month sentence.

Turning to the characteristics of the defendant,
Mr. Cantwell has a history of disrespect for law and of this
court.  He has had prior contact with law enforcement, as set
forth in the presentence report.  And while he has no criminal
history points, he does have a conviction for disorderly
conduct.  And while on pretrial release, he failed to check in
on ten separate occasions, as well as the disrespect he showed
while in the military.

I don't know what Mr. Cantwell will stand up and say to you
today.  Maybe he'll talk of his remorse or regret.  But his
actions speak louder than words.  And his actions on January 6
were to rile up the crowd and to attack the very seat of our
democracy.

And here's a good place to talk about Mr. Cantwell's

acceptance of responsibility.  The government is not saying that he is not entitled to a guideline adjustment.  He entered a plea agreement.  However, after January 6, when he was interviewed by the FBI, he minimized his conduct, and in his Facebook posts, which is Exhibit 14, he again minimized his conduct on January 6.  In his sentencing memo, he said that he was documenting historic events and helping people.

Your Honor noted that this Court did not take Mr. Cantwell's plea, but at one point when we were before Judge Sullivan, we had to recess because Mr. Cantwell was having a difficult time getting through the factual basis, saying he was there to help people, and Judge Sullivan said okay, then we should set this case for trial if he didn't do anything wrong.

In his sentencing memo, document 51 at page 3, he says he was there to record historic events, that he, quote, found himself in the middle of violent rioters.  But he worked his way directly into that violent mob.  He did not have to go onto Capitol grounds that were restricted.  He didn't have to go to the tunnel.  He didn't have to stay after he was kicked out of the Lower West Terrace tunnel.

Maybe he'll say that he cooperated with the House Select Committee, as he did in his sentencing memo at page 4.  The government submits that is a different branch of government.  It has no impact here.  And we have no idea what Mr. Cantwell said in that interview, or if it was helpful.

Maybe he'll say he has no criminal history.  But that has already been taken into account by him being a criminal history category I.  And as noted, he does have a prior conviction for disorderly conduct.  That's in the presentence report at paragraph 41.

Maybe he will say he had a difficult childhood, as he did in his sentencing memo at pages 2 and 3.  And the government doesn't take issue with the fact that he had a difficult childhood.  Whatever difficulties he's had, he has been able to overcome.  He got a high school diploma, started college, was accepted into the Army.  He even started his own business.  So a difficult childhood doesn't explain his choices to engage in criminal conduct on January 6.  There are many people with difficult childhoods that don't go to the Capitol and don't encourage other people to attack police officers.

Again, I don't know what Mr. Cantwell will say, and I don't mean to impugn him with what has happened in other courtrooms with other defendants.  But I will say to Your Honor many defendants at the time of sentencing, that's when they say they're remorseful, when they're standing before a judge.  But again, Mr. Cantwell's actions on the 6th and actions after the 6th do not demonstrate remorse.

Maybe he'll point to all the letters of support from all the people who support him, love him, et cetera.  I'm glad he has that family support.  That can help him integrate back into

society after he is released if he is incarcerated.  But all those people who love and support him, that did not deter him from going to the Capitol and encouraging others to assault police officers.

Now is the time I would like to turn to Mr. Cantwell's assertion that he helped people on January 6, that he helped a woman and that he helped an officer.  It might have been Officer Fanone.  As we found in a video that has been submitted to the Court as Exhibit 16, we now know that in addition to Officer Fanone, there was another officer out in the crowd, Capitol Police Officer M.M.  And from watching those videos, it is not clear that Mr. Cantwell assisted anyone.  If anything, the videos we've already watched in court already show that he is not doing anything to assist officers.

When we look at Exhibits 11 and 12 that we have played, there is no evidence that he is assaulting officers.  When we look at Exhibit 16, there is no evidence he is assaulting officers.  It's possible he did, because in watching these videos, there are so many people, and the crowd is so dense, and it is so hard to track Mr. Cantwell, Officer Fanone, Officer M.M.

It does appear in a video that at one point, at the beginning of Exhibit 12, Mr. Cantwell bends down where he might be assisting someone.  It is possible he is assisting a law enforcement officer.  It is possible he's assisting another

rioter who fell down.  However, Officer Fanone said, when asked, "What do you say to the people that helped on you January 6?" Officer Fanone very colorfully said, "Thank you, but F you for being there," except Officer Fanone used the full word.

So again, I have not seen any evidence that Mr. Cantwell helped anyone.  It is possible that he did.  But he shouldn't have been there in the first place.  And as the timeline that we've laid out for Your Honor, he wasn't helping police before Officer Fanone and Officer M.M. got pulled into the crowd, and he surely was not helping police afterwards, because we watched him engage in the heave ho effort and the calling other people closer to him.  He said, "There are 45 cops and a million people outside.  They're not going to hold everyone back."

Mr. Cantwell's actions on January 6 contributed to other rioters and law enforcement getting hurt.

Who do we know for sure helped out on January 6?  The lawmakers and their staff who hid for hours and hours while the riot ensued, and they still had the bravery to come back, reconvene at 8:00 p.m., to count the electoral votes and stayed until 3:00 a.m. to finish their constitutional duty.

Who else demonstrated this benefit to the community?  The janitorial staff and other Capitol staff who cleaned up the Capitol from the debris that was all over the Capitol building, members of the Architect of the Capitol's office who had to repair the damage to the building, the millions of dollars of

damage to the building, including those doors right where Mr. Cantwell was filming and calling other people to come closer, to get the Capitol ready for the inauguration that was to take place on January 20th.

And the hundreds of police officers from dozens of agencies, they're the ones who helped that day. They're the ones who battled for hours and hours and hours.

At 11:00 today, in the Rotunda of the Capitol building, the center of the city, D.C. itself, members of law enforcement were awarded the highest honor that Congress can give. They were awarded with the Congressional Medal at 11:00 this morning. They were the heroes. It was the Congressional Gold Medal that they were given this morning. It was their generosity, work ethic, willingness to lend a hand to the community, the people that Cantwell urged people to fight, those are the heroes.

As Officer Fanone described in the sentencing memo about Commander Kyle, "Despite the confusion and stress of the situation, observing the commander's leadership protecting the place I care so much about was the most inspirational moment of my life. The bravery he and others showed that day are the best example of duty, honor, and service."

Mr. Cantwell's history and characteristics support a five-month period of incarceration.

And to promote the seriousness of the offense and promote respect for the law, we've already spoken about the seriousness

of the offense, and everything about Mr. Cantwell's actions show his disrespect for the law.  All of his actions were voluntary on January 6.  And again, we already talked about his failure to report ten separate times when on pretrial release.

The recommended sentence would provide both specific and general deterrence.  If Mr. Cantwell is not sentenced commensurate with the gravity of his crimes, then what message will that send to the others?  What message will that send to Mr. Cantwell specifically and the publicly generally?  What happens when members of the public don't like the next election we have, when they don't like the outcome of the next election if there is not a serious sentence imposed in this case?

We don't want the message being sent that someone can commit a serious act and suffer mild consequences.  At his inauguration in 1981, President Reagan said, "In the eyes of many in this world, this every-four-year ceremony that we accept as normal is nothing less than a miracle."  And without a sentence to deter defendant Cantwell and others, that miracle will be harder and harder to achieve, and the miracle will become more and more tarnished.  Let's ensure that Mr. Cantwell and others are deterred from committing the same type of criminal conduct that attacked our democracy on January 6.

Finally, a five-month sentence will avoid an unwarranted sentencing disparity.  Thousands of people came to Washington, D.C. on January 6, and they did not all go to the Capitol.  And

1    even of the thousands and thousands of people that entered the

2    restricted perimeter of the Capitol, they did not all go onto

3    the Lower West Terrace, the stage set up for the inauguration,

4    and they didn't all go into the tunnel.  They didn't all

5    encourage violence.  They didn't all stay for over two hours.

6        When Your Honor sentenced Jerry Ryals in Case 21-cr-244 in

7    late October, I believe Your Honor sentenced Mr. Ryals to nine

8    months.  And while Mr. Ryals did go inside and help break into

9    an office door, Mr. Cantwell didn't go inside, but he did

10   encourage violence.  And you said in that case, "Your actions

11   and participation in the mob helped create the momentum of

12   violence by you and others participating in the insurrection.

13   That provided safety for the violent actions of others.  Even if

14   you didn't hit a law enforcement officer, others did.  You were

15   there encouraging them, and you gave them cover to do that."

16       And that's exactly what is going on in Mr. Cantwell's case.

17   While he didn't personally put his hands on a law enforcement

18   officer, he gave others coverage.  He encouraged others.

19   Violence is an unacceptable way to resolve our political

20   differences.  There are lawful means available in a democracy to

21   change or challenge actions that someone disagrees with, and

22   those don't include a violent insurrection.

23       Mr. Cantwell's presence and the actions of others joining

24   in the insurrection was an inexcusable attack on our democracy,

25   and the peaceful transfer of power according to the

Constitution.  It is certainly a disrespect for the rule of law which governs civilized society.

The government has set out similarly situated defendants in its sentencing memo, and the recommendation of five months is appropriate.

I will finally wrap up.  I know I've been speaking a long time.  On January 6, 2021, Mr. Cantwell made a series of choices that at any time he could have stopped his criminal conduct. This was not one mistake.  It was a series of voluntary choices. And instead of being turned off by what he saw, Mr. Cantwell made the choice to purposefully and voluntarily move closer and closer into the chaos and become a part of that chaos.  Instead of leaving, he made the choice to move closer to the medieval battle taking place.  In the thick of the combat, he made the choice to encourage others to join in the brutality directed towards the police guarding the Capitol, the police trying to protect the men and women who work inside the Capitol, and the police defending our very democracy.

In his Facebook post, Exhibit 14, Mr. Cantwell says he's a patriot that loves his country.

THE COURT:  You have to slow down.  You're going too fast now.

MS. SCHESNOL:  In his Facebook post of Exhibit 14, Mr. Cantwell said he's a patriot that loves his country.  But what Mr. Cantwell did on January 6 is un-American and

unpatriotic.  He wasn't acting on behalf of the country.  He
wasn't acting out of patriotism.  He was acting out of
tribalism.  The rioters who attacked the police have no claim to
the word "patriot."  They engaged in domestic terrorism.

     And the government recommends a sentence that will make
clear that the actions that Mr. Cantwell took on January 6 will
be met with the punishment.  This crime merits a sentence of
five months' imprisonment, a term of supervised release, $2,000
restitution, and the required $100 special assessment.

     Thank you, Your Honor, and thank you for letting me speak
for such a lengthy period.

               THE COURT:  All right.

               MR. COCIS:  Good afternoon, Your Honor.  I will be
very brief.

     As I was listening to the government's --

               THE COURT:  You can take your mask off, because it is
hard for the court reporter to get it, as well as me.

               MR. COCIS:  As I was listening to the government's
position regarding Mr. Cantwell, it came to me a quote said by
Aristotle some 2,500 years ago, and he said, "You are what you
constantly do."  "You are what you constantly do."

     So I wanted to say thank you, Your Honor, for listening to
or reading Dr. Romanoff's report and his evaluation of
Mr. Cantwell, because that represents Mr. Cantwell for who he
is, as a human being with all the faults, failures, all the

1    obstacles that he's overcome in life, and with all the

2    achievements that he's accomplished.

3        I think we could all agree that there's more to

4    Mr. Cantwell than just what he did on January the 6th.  I think

5    that the character reference letters that we've submitted on his

6    behalf attest to that fact.

7        And looking at his conduct on the 6th, I think he would

8    readily acknowledge and the videos show that he was not just

9    merely a bystander or some sort of a looky-loo there.  The

10   videos, like I said, speak for themselves.  However, on the

11   other hand, he was not a leader in this lawless and disorganized

12   mob of people.  He did not steal anything, as others have done.

13   And he did not assault any police officer.  And in looking at

14   the video that the government has played as far as the heave ho

15   portion of the video, there's no evidence that he himself

16   verbalized heave ho.

17       In talking to Mr. Cantwell, he tells me he was caught up in

18   the wave.  He shouldn't have been there in the first place.  He

19   agrees with that.  He got caught up in the wave.  He did not

20   verbalize heave ho.  I thought I would mention that to the

21   Court.

22       And despite what the government claims, Mr. Cantwell

23   maintains that he did help a police officer, which was most

24   likely Officer Fanone.  And I will let Mr. Cantwell address that

25   portion of the timeline in his actions on January the 6th so the

1    Court can see the veracity -- or see his veracity.

2        Mr. Cantwell also mentioned to me that the prosecutor's

3    timeline is incorrect, and I will let Mr. Cantwell address that,

4    too.

5        With that in mind, Your Honor, I thank you for reading the

6    probation officer's report, Dr. Romanoff's evaluation, and the

7    character reference letters that were submitted.

8        And with that, I would recommend to the Court or suggest to

9    the Court what I have suggested -- as far as a sentence is

10   concerned, what I have suggested in Mr. Cantwell's sentencing

11   memo.

12       Thank you.

13       THE COURT:  If I could just ask in terms of --

14   obviously, the video sets certain things out, and he has not

15   disputed what the videos have shown.  He has indicated --

16   whether he helped protestors or not, it's hard to tell, frankly,

17   looking at it.  They were packed so closely.  Maybe he did;

18   maybe he didn't.  But I have to say, in looking at the videos,

19   which is why I asked for them, so I'm not left guessing here,

20   looking at the video relating to Officer Fanone, most of the

21   videos show he's up at the front, and it's not clear to me,

22   because it's not too easy in terms of -- Officer Fanone is

23   further down, because he did wind up basically on his back being

24   dragged.  There's only one place where he -- you can see the

25   name of Fanone, but the defendant isn't -- there's nothing that

1    indicates there that what he was doing was in some way helping,

2    and he's farther off.  He's not looking at them.

3        So I must say that it's hard to -- and maybe he did help an

4    officer.  I will hear what he has to say.  The videos, which are

5    the best I have, are at least some description of what occurred.

6    But that's why I asked for the additional information.  Whether

7    there's something else out there, I don't know, but clearly, one

8    of them, they were quite far apart.

9        There was only one where he could be viewed as being not

10   that far away.  But he's looking in a different direction.  He's

11   not looking at all at where Officer Fanone is.  And I know it's

12   Fanone, because he's got his name either on his hat or someplace

13   that has the name.

14           MR. COCIS:  The famous neck tattoo?

15           THE COURT:  No, it wasn't that.  It was something that

16   was higher up, which was what told me that, because the rest of

17   his body was -- you couldn't see it.  This is Fanone.  Based on

18   the crowd.  I can figure out who Mr. Cantwell was.  But he

19   wasn't -- if he was helping him, he certainly wasn't looking at

20   him in terms of doing anything, and that's the only place that I

21   know they were anywhere near each other.

22       The rest of them, Mr. Cantwell's way at the top, and Fanone

23   at least was further away.  There was no way that he could help

24   him.

25       I just throw this out.  Everybody can respond to it.

1    In terms of the protestors, I will take his word for it

2  that he did.  It's very hard to see whether there was somebody

3  in particular or where it was.  Everybody's packed closely other

4  than a few places.

5    But in terms of law enforcement, particularly since you

6  raised Fanone, I had difficulty having some support for that,

7  unless you have something else you want to address.

8    I will also hear from Mr. Cantwell.

9         MR. COCIS:  I've asked Mr. Cantwell to provide a

10  chronology of his events based on the video which I've submitted

11  to the Court.  Like I said, he will describe from his

12  perspective what he did and try to pinpoint as close as he can

13  on a timeline his actions.

14         THE COURT:  Okay.

15         MR. COCIS:  Does the Court want me to stand here with

16  Mr. Cantwell?

17         THE COURT:  You can sit where you are and speak into

18  the microphone, or you can come up here.  Whatever you wish.

19         THE DEFENDANT:  I'll come up.

20    Good afternoon, Your Honor.

21    I'm just going to start with kind of the chronological set

22  of events that you were just discussing about me helping the

23  officer.

24         THE COURT:  Okay.  You need to speak into the

25  microphone.  Move it over a little bit.  You can move the whole

1  thing.  There you go.  You need to speak directly into it.

2          THE DEFENDANT:  I'm at a bit of a disadvantage because

3  I don't have the video at hand to be able to kind of coordinate

4  with you at the same time.  But I can go off of what the time

5  stamp on that video was, which is obviously not the exact time

6  of the day.  It was just in the video, because it was an hour

7  and 25 minute video.

8          THE COURT:  It's the time on the video itself for the

9  most part?

10          THE DEFENDANT:  But it's not time-stamped at 3:18 or

11  3:40.  It's at its own.

12      So at 55:27 of the video, Daniel Rodriguez, who has already

13  been charged and convicted of pulling Officer Fanone out into

14  the crowd, can be seen pulling Officer Fanone into the crowd.

15      At 55:30, Officer Fanone can be identified by his name tag

16  and recognizable neck tattoo.

17      At 55:34, I could be seen coming out of the tunnel entrance

18  about a four-person distance away from Officer Fanone.  At this

19  point I have not yet realized that police officers have been

20  pulled through the crowd and down the stairs.

21      At 55:48 --

22          THE COURT:  Let me just ask, do you have the video?

23  Put it on and let him show where he's thinking -- are you

24  talking about the video itself?

25          THE DEFENDANT:  Yes, ma'am.  I would like to show you.

1          THE COURT:  You put it on, and you tell me what you

2     see.

3          MS. SCHESNOL:  Just for clarification, are we talking

4     about the video that you submitted?

5          THE DEFENDANT:  That we submitted, yes.

6          MS. SCHESNOL:  So from a technical standpoint, I'm not

7     sure that that's on my desktop, but I will do my best to access

8     that.

9          THE COURT:  Because I looked at the ones that were

10    provided by the defendant.  That's why I was saying I had

11    difficulty seeing the assistance.

12         MS. SCHESNOL:  The issue with technology is usually

13    that only items on the desktop can be accessed.  Since that was

14    not a part of my presentation, I'm not sure it's on my desktop,

15    but I will look for it.

16         THE COURT:  We have the --

17         MS. SCHESNOL:  This might be it.

18         THE COURT:  We have it.  If you don't have it, we will

19    get it.  You can show me where you --

20         MS. SCHESNOL:  So the video --

21         THE COURT:  Is that the video you're talking about?

22         THE DEFENDANT:  That's kind of the video.  Yeah,

23    that's it.  This is where you can see Officer Fanone is --

24         THE COURT:  You're going to have to point him out.

25         THE DEFENDANT:  That's Mr. Rodriguez.  That's who is

1   pulling on Officer Fanone.  And then --

2           THE COURT:  Where are you?

3           THE DEFENDANT:  I'm about to be pushed out of the

4   tunnel.

5       The reason why the police made a mad push was because --

6   from my gathering was that the officer had been pulled from the

7   line.  From what I could see, the line was much further back

8   into the tunnel.  I was on the left-hand side of the inner side

9   of that tunnel standing on the wall.  There's a little lip

10  inside of there.  He got pulled out, and then the police made a

11  mad push forward to claim their officers.

12          THE COURT:  Show me where the rest of the --

13          THE DEFENDANT:  So he's right there.

14      I'm sorry.  I'm at a disadvantage not knowing how to

15  operate this.

16      So right here is Officer Fanone.  This is his neck tattoo.

17  His name tag is right there.  It's hard to see, but when you

18  zoom in it, you can read it.  And then he gets pulled down, and

19  I'm -- that's me.  So I'm about four people between.

20          THE COURT:  You're on the other side of the person

21  with the red shirt?

22          THE DEFENDANT:  I'm the one circled in red, and he is

23  circled in blue.

24          THE COURT:  That's what I remember.

25          THE DEFENDANT:  That's right whenever I get pushed

1    out.  I haven't realized like where everybody is at, what's

2    going on at this moment.

3         Right here, we're about to get pushed down.  Officer Fanone

4    is, obviously, down below me.  Here we go.  We're starting to

5    get pushed down.  Somewhere at this point here is when I

6    actually begin to realize that the officers have been pulled

7    down behind me.

8              THE COURT:  And where are you?

9              THE DEFENDANT:  I have to back it up.  I lost myself.

10   Sorry.  Right now, I'm at the bottom.  This is me here in the

11   blue.  That's how far down I am.

12             THE COURT:  And where is Officer Fanone?

13             THE DEFENDANT:  He's not in the frame of the video at

14   this moment, but he's not -- he's still about four people

15   distance from me, maybe three at this point.

16             THE COURT:  Okay.

17             THE DEFENDANT:  This is my hat right here.  That's me

18   down trying to grab the officer's leg.  Okay?  There were people

19   grabbing at him from every angle.

20        So I'm going to keep moving.  You can see everyone's kind

21   of looking down in the same direction.  The problem is, this

22   whole section here, it's kind of panned away.

23        Okay.  Right here is me again.  I've come back into focus.

24   I've turned around.  And then right here, you see that?  I'm

25   telling people not to hit at the officers.  There's two people

with flag poles that were actively attacking the officer.

Now, that may have been Fanone there.  I'm assuming it was Fanone still because of the proximity.  It may have been the other officer they were attacking, but I'm sticking with I thought it was Fanone.

THE COURT:  Where is the officer?

THE DEFENDANT:  He is behind this flag.  The officer's like right here somewhere.  Someone behind this flag pole is hitting at the officer, and I'm actively telling them to stop, no, don't do that.  I shake my head and my hand at him.

And then it looks like the people who are -- I've got it written down now.  At this same time in the video, you can hear the crowd chanting, "Let the cop go.  Let the cop go."  And they say that from about -- they chant this until 56:41 -- from 56:20 roughly.  So they're chanting it like 20, 30 seconds of "let him go."

Based on this point, I notice that people weren't actively attacking him anymore after this.  They were still holding onto him and pulling on him.  Granted, everything is extremely chaotic.  And so it looks terrible inside of there.  They're all over him.  But in the general aspect of it, it looked like the main people had stopped pulling and attacking, and some of the protestors who were helping the officer -- because there were people who were trying to pull others off of them.  Like some were pulling at him for harmful means, and some were pulling,

1    you know, for -- to help him, basically to bring him back up.

2        When I noticed that it seemed like he was under control, he

3    was more laying leaning backwards into the crowd and people had

4    ahold of him, I turned my back to kind of go up the stairwell.

5    And I thought they were going to be bringing him back up that.

6    And they didn't bring him up that same route immediately, but

7    I'm not actively like attacking police or anything here.

8        And this man here, he starts to try and calm the crowd.

9    And then I immediately follow suit by trying to calm the crowd

10   as well right there.

11       Now, before all of this, I am in the tunnel, and I am

12   100 percent guilty of encouraging people to come forward still.

13   But at a certain point when the police officer was pulled out of

14   the crowd like that and I saw people attacking him, it did

15   change my demeanor.  I stayed because I thought I was justified

16   in protesting or being there more or less.  I didn't, obviously,

17   want people to get hurt.  I didn't want police officers

18   attacked.

19       I should probably go back to what I'm saying.  Somewhere in

20   here, there's a cut in this video, like the prosecution has

21   displayed.  Like she said, there's gaps in the video.  There's a

22   section here where it's another minute longer or so.  It gets

23   kind of bunched up.  I cannot be -- and I won't stand here and

24   say 100 percent that I helped Officer Fanone.  But I do know at

25   some point that I did help a police officer and carried him with

another person after a police officer from that line in that
same situation -- same about -- it was a little more packed.  He
asked, "Someone please help me get my friend."  And me and
another person looked around, like, "What do you need?"  And he
was like, "Help me get my friend."  And me and this other person
reached down maybe three steps.  He was face down.  And I
grabbed him on his left shoulder by his vest and handed him to a
Capitol Police officer in the line with another person.

There were several people who had hands on him that were
trying to lift him.  He was actually pretty heavy.  So in no
means am I trying to demean what I did that day.  I am guilty of
that 100 percent.

I honestly thought that I would never be in this
experience.  This is one that I've tried to avoid my entire
life, being in a jail setting or a court setting or having to
answer to anybody for my idiocy.  I've had nearly two years to
come to terms with my actions of January 6, and I am still
mortified by my behavior.  I have shamed my family name for all
of history to remember, because I can't -- this won't ever go
away.  300, 400 years from now, people may read that I was so
stupid.  It brings a disgrace to my family name, and I can't
imagine the anxiety and the vivid memories that the Capitol
Police have to deal with every day, because just being in that,
it causes me endless sleepless nights.

Watching the videos just gives me anxiety, and they were

berated by their own brothers and sisters for doing their

patriotic duty.  My actions that day directly encouraged others

to obstruct officers in the commission of their duties, and I

can never take that back.  I can never make it better.  But I

can accept full responsibility, which is what I'm doing here

today.  It's a first step in a series of steps by not only me

but everyone else who needs to come up and accept responsibility

in the healings of the wounds of this country that I actually

helped to exacerbate.

So I would like to address another thing about the Facebook

post that the prosecution -- I no longer have any social media.

I deleted it within probably two weeks, so that way I couldn't

be inundated with any more lies, any more scandals, any more --

I don't care anymore.  Unless it's good for us, I don't want to

hear about it.

So my Facebook post was approximately six hours after I had

driven home, covered in pepper spray, from here all the way back

to North Carolina.  I had just woken up.  I hadn't seen any news

yet.  And the time stamp of the post is 6:00 a.m. that next

morning, on July 7 (sic).  So it's not like it was, Oh, I

haven't accepted responsibility.  At that time I hadn't because

I hadn't realized what I had done.  I hadn't had the opportunity

to see what had happened.  I didn't even know that people had

gotten in the building.  I told everybody no one got in the

building, that it was impossible, because where I was standing,

1    the officers did what they were supposed to.

2        And yeah, there were a million people outside, and those 45

3    officers did way better than I would have done.  I don't even

4    know how they did it.  They held that corridor like pros,

5    because they are pros.

6        I just want it to be noted that some time around this

7    period was when my demeanor changed.  I'm all for our rights,

8    for protesting.  I had never even been to a protest.  This was

9    my first ever.  I had never been to a rally.  I had never been

10   to a support group for a politician, nothing.

11       I was coming up here to bond with my new girlfriend's dad.

12   I had no intention of ever coming here.  I only did it so I

13   could bond with her dad, who was a huge Trump supporter.  So I

14   figured an eight-, nine-hour car ride on the way here would --

15   and then another eight-, nine-hour car ride.

16       But we didn't bond.  It just drew us further apart because

17   of this.  Me and her are closer than ever, but sometimes the

18   best intentions.  Right?

19       I had no intention to come and stop anything or interfere

20   with anybody.  I just came to bond with my potential future

21   father-in-law.  What I did that day was still disgraceful in the

22   tunnel and outside.  I just want it noted that -- and I did

23   cooperate with the January 6th Committee, and I told them

24   basically the same thing I'm telling you, is that what I did was

25   abhorrent.  I shouldn't have been there at all ever.

When I'm encouraging people to come forward, it doesn't necessarily mean I want violence. There's a later portion in this video where I also try and help stop someone from using an open mace canister at the police from this front line. And it can be seen. I can show you this now if you want.

But my whole point is my demeanor changed. Yes, I stood up front, and I stayed there. I also have a point where this man right here, he stands there with a megaphone, and he asks everyone to sit down and peacefully protest. And I can't find this video anywhere. I found where he does it. It's in this video. But in another video or any other video -- I've looked through thousands of hours of video, thousands, literally in places I wasn't even at, just to see if someone was there near me that was there.

I actually sat down with this same man with his blowhorn and tried to get everyone to sit right then. No one would sit. Some instigators from the crowd got everyone riled up. Everyone was calm for about 15 minutes during this period right here after the officer gets pulled out and when he gets brought back. Everything is calm for a while. And instigators rile everything back up. So I stayed there, because I was effectively thinking that maybe I could help.

And I did touch that flag pole. I actively reached back and asked people to hand me that flag pole because people had been beating us trying to hit officers. They beat us in the

1   back of the head.  They threw stuff at us in there -- sticks,

2   ladders.  There's a whole multitude of items that were used,

3   shields, mace canisters.

4       So as opposed to me being up on the front now, I'm standing

5   there, and me and another gentleman reach over, and we grab the

6   flag pole and purposely aim it over the police's head.  The line

7   is maybe two or three people past us.  And all we do is push.

8   You don't see me trying to hurl it or hold on to it and use it

9   as a battering ram.  I just calmly try and push it over with

10  several of us.  We just aim it and pass it along.  Because we

11  had been passing some things along.  Things that made it up to

12  us standing there, we were passing things forward.

13      There's plenty of people who were acting crazy, like

14  jumping up on top, walking on the crowd, spraying.  I think

15  there's a difference between being in that protest and being an

16  active, like, trying to assault the police.  To my honest

17  knowledge, I didn't even know that -- like when I went up to the

18  Capitol, I was just told by a person on the street that we were

19  going to be having speakers up at the Capitol, that there was

20  someone we were going to be listening to up there.

21      Since I could barely even hear anything at The Ellipse

22  rally, we weren't even going to go there.  Everyone who was with

23  us went back to the van, and I only went up there to go -- and I

24  saw everything all chaotic, and it got me all hyped up.  I

25  haven't been in a chaotic situation since I was in the military.

I did not let my training guide me and make cool and calm
decisions, and I ran my mouth.  I was videoing for people back
home who are patriotic.  I was stupid, and I riled people up
when I shouldn't have.

I do take the probation for the Court very seriously.  I'm
not giving these as excuses, but I will tell you some of the
reasoning.  In the beginning, if you will notice my absences for
checking in would be the second week, the fourth week, like the
seventh week.  It was all when I first -- most of it was when I
first started.  I reliably checked in the last 19 check-ins.

At the beginning, COVID was very hard on the probation
system, and I had discussed that even with Judge Sullivan, and
he brought that up to the Probation Office in, I don't know, one
of our earlier things.  There was like one person answering a
bunch of phones, and I would try and call, and I just couldn't
get through.  And sometimes, it was my own fault because I
waited until a Friday to call.  Yeah, maybe waiting until 3:00
on a Friday to call is a bad idea, especially when you're
checking in with Probation.  I'm new to the system.  I don't
know much at all about this.

But I made sure that I have reliable ways to follow through
with the probation.  Like, I put sticky notes on my car so I
would 100 percent remember.

I live in an area that has terrible service.  You can drive
for 45 minutes and not have a single bar of service where I

1   live.  So sometimes when I go to work, I'll be gone all day and

2   come back and try to rush to use my phone and call.  Sometimes I

3   miss it, and sometimes I didn't.  It's no excuse.  I should have

4   paid better attention.

5   One of those specific instances was the Juneteenth holiday.

6   I didn't realize that that Friday we would be off, that it would

7   actually be closed, the Probation Office.  And generally, when I

8   did miss, I called first thing the next week to try and like

9   remedy it.

10   I thought I had the probation officer's number, but I

11   actually only had his office number.  So sometimes I would call

12   him to try and mitigate me being late or it being the end of the

13   week.  Either way, there's no excuse, but I just give you some

14   reasons why I missed those.  They were still my own fault

15   ultimately.

16   But if you do choose to not give me any jail time, I will

17   respect the probation services.  I will adhere to everything

18   that they ask 100 percent.  But I'm at the leniency of the Court

19   and the country basically, you know, for my own terrible

20   actions.  And whatever I get today I will do with honor, because

21   that is what I've earned, and no one else can fill that shoe but

22   me.  I'm the only one who can go and take responsibility for it.

23   So that's what I'm here to do.

24   THE COURT:  All right.  What I would like to do is to

25   take a break at this point so I can go back and look over my

notes and what has been said.

I have three minutes after 3:00.  I'm going to have it be 3:20.  I'm always overly optimistic.  But if I'm going to be later, I will let Ms. Patterson know so that she can let you know.  All right?

So the parties are excused briefly at this point.

(Recess taken from 3:03 p.m. to 3:48 p.m.)

THE COURT:  Sorry it took so long.  It took me a while to go through my notes again and reorganize things based on the comments, and some of the videos, I think, were not included in the original thing that we received.  So I wanted to go back and make sure I looked at everything.

At any rate, to continue, in addition to the advisory sentencing guidelines, the Court considers the pleadings, arguments, and record in this case, in addition to the following information, in determining a fair, appropriate, and reasonable sentence in conformance with the factors set out in 18 U.S.C. 3553(a) et seq. except for (e).

Mr. Cantwell is 36 years old.  In terms of criminal history, he has been convicted of disorderly conduct in a trial. The sentence was a fine.  He's had eight traffic adjudications from ages 21 to 33, speeding, no license, seat belt infractions, and some fines were imposed.  There were four other traffic infractions that were dismissed.

In terms of education, he's a high school graduate.  He has

three semesters of college, trained as an EMT, has a past license as a forklift operator.  Job history, he joined the U.S. Army in 2005.  He was being trained in explosive ordnance disposal.  He self-reports that he was actually assaulted by superiors.  He did not report it within their system, went AWOL, was arrested at a later point for desertion, and in 2007 was discharged and was arrested for desertion in 2007.  He was discharged in 2009 for other than honorable discharge.

And Dr. Romanoff does describe other reasons as well that contributed to his going AWOL.

In 2020, he opened a Kava Bar Tea House.  That evidently was quite successful.  He closed the business when he was arrested.  2015 to the present, he's been a networking engineer at Skyrunner Internet.  2012 to 2015, he worked for Boat N RV.

Financial condition, he presently appears to have an annual salary of approximately $50,000 plus.  He has 401(k) accounts, has monthly income available after deduction for expenses.  So although he has financial ability to pay a fine, I'm not going to impose one.  He has the $2,000 restitution that he needs to pay.

Physical condition, he has had COVID.  He's not on any medications.  In terms of mental health, emotional health, he was severely physically abused as a child by his biological parents and stepfather and self-reports sexually abused in the military.

1    I did review Dr. Romanoff's report, who concludes that he

2    doesn't have any present mental health needs.  I saw it as a

3    report that really addressed the unlikelihood that he would

4    recidivate.

5    Substance abuse, started drinking alcohol at age 10, on and

6    off has smoked marijuana, has tried cocaine, mushrooms.  He

7    doesn't have any drug treatment history.

8    On a personal basis, in terms of family history,

9    Mr. Cantwell was born in Florida.  At around the age 2 years,

10   his parents separated.  At one point, he went to live with his

11   father.  His mother at a later date challenged his father's

12   custody based on the physical abuse.  The father lost custody.

13   He then lived with his mother and stepfather until he left for

14   college.  Both his father and stepfather physically abused him.

15   Father and stepfather were very cruel, and the description of

16   the physical abuse was terrible.  And he also suffered some

17   verbal abuse.  His mother did not appear to intervene and

18   occasionally participated in the cruel punishment.  He spent

19   certainly a deprived and abusive childhood.

20   He has had two marriages, one of a very short duration.

21   Second one produced a daughter, now 14 years old, and he's

22   presently in what appears to be a supportive relationship.

23   In terms of Dr. Romanoff's report, he self-reported in that

24   his background, his family, his personal history, which I've

25   gone over, as well as from the presentence report, and also

describes his view of the January 6 events.

I did receive letters in support, both from his girlfriend, in terms of her description of his kindness to her and to others in the community.  Friends speak of his generous spirit, patriotism, contributions to the community.

In terms of the Statement of Offense, and I will not go through the background, which I think everyone knows.  I will focus strictly on his participation, as evidently he agreed to because Judge Sullivan accepted the plea.

On January 6, 2021, Mr. Cantwell went to the U.S. Capitol with hundreds of other individuals who participated in the riot at the Capitol.  Mr. Cantwell made it to the front of one of the entrances into the U.S. Capitol, used his cell phone to make several video recordings of individuals battling with law enforcement officers from the U.S. Capitol Police in order to enter the Capitol building.

During one of the recordings, when watching rioters battle with law enforcement officers near an entrance, Mr. Cantwell yelled for the rioters to, quote, Get the door open, unquote. At another point, Mr. Cantwell yelled that they needed, quote, Fresh patriots to the front, unquote.

When Mr. Cantwell encouraged the rioters to get the door open and encouraged more rioters to come to the front where the rioters were battling with officers, the defendant knew that the officers were engaged in the performance of their official

1    duties.

2         In terms of looking at the 3553 factors, obviously, one of

3    the first things that one looks at is the seriousness of the

4    offense.  This is a serious offense which involves your joining

5    a mob of rioters, interfering with law enforcement trying to

6    keep you and other rioters from entering the Capitol when you

7    and other rioters were not authorized to be on the Capitol

8    grounds or in the Capitol.

9         The rioters' goal was to stop the certification of the vote

10   count of the Electoral College of the 2020 presidential

11   election, and they succeeded at least in postponing it.

12        I've looked at the videos provided by both parties, and I

13   again saw some of them in the courtroom today.  The videos

14   depict Mr. Cantwell particularly on the Lower West Terrace

15   entrance and doorway, where in a narrow space rioters were

16   battling the Capitol Police and a few MPD officers who were

17   trying to keep the mass of rioters from entering, which would

18   have given the rioters full access to the Capitol.

19        There's also some footage as well outside when the police

20   had pushed the rioters back from the Lower West Terrace entrance

21   and doorway who were also trying to get back in again.

22        It's not disputed nor rebutted by the defendant that he was

23   in the front part of the mob in the tunnel while the mob

24   attacked violently and viciously the law enforcement officers, I

25   mean mercilessly physically attacked them, throwing objects at

them, a baton, flag poles, police shields, spraying them at times with some sort of chemical irritant.

Although the defendant did not strike or spray the chemical irritant, he did move along a flag with its pole directed at the officers at least at one point.  His motivation, the pole still was directed at the officers.

He also witnessed the violence and lent support to the rioters' efforts by at one point rocking back and forth with the group, which resulted in a force that needed to be used in terms of the exertion of moving back and forth trying to get back in and to overcome the officers.  When the mob itself was pushing forward towards the officers, he was participating.

He also yelled at one point, "We essentially stormed the Capitol."  Statements like "liberty or death."  He waved at those in the back of the mob.  This was particularly in the tunnel.  Yelled to make -- to move forward, quote, Fresh patriots to the front.  He did this more than once in order for them to have people continue the battle with the officers.  The defendant yelled at another time, quote, Get the door open, referring to the door in the hall in the tunnel where the officers were trying to keep them out.

He took videos of the assault on the officers, including MPD Officer Daniel Hodges, who was caught in the door crying out in pain, who was being crushed by the mob between the doors, as well as his comments to the mob encouraging them to continue

with the violence.  All of this is on the videos.  The defendant
is in the lower west tunnel with the continued battle and
violence before they got pushed -- the rioters got pushed out
from around 2:40 to 3:18.

He then remained on the grounds for about another hour.  I
would say that he made no attempt to leave the violent scene
except ultimately when he was pepper sprayed.

In terms of those going into the tunnel, at the point that
he came in, others were actually not coming in but going out and
not going in.  So he certainly had opportunities not to go in.

During the violence, while he recorded it, he lent support
to the violent actions of the others against the officers who
were carrying out their official duties.  He was complicit in
the violence.

The videos show officers in the tunnel moving back to have
the chemical irritants washed off their faces by other officers.
There was showing what -- beyond those in the front battling the
rioters, that they from time to time would move back to have the
irritants, you could just see it on their faces, washed off.
They were tending to the wounded.  There were those that were
lying on the ground trying to recuperate.  And then they
returned to their duties of battling the rioters and trying to
prevent them from entering the Capitol.

The prosecutor is correct.  Those officers are heroes that
finally Congress has recognized as deserving of honors and

medals.  But those medals will never compensate them for the violence perpetrated against them on January 6.

The defendant, at the interview with the FBI, and he did willingly go, and in his Facebook account, which he did evidently the next morning, he indicates he went to the doors of the Capitol to, quote, Help people, police and protestors, that he treated people with respect and love, that he saw no damage.

Well, he said on Facebook that the rioters broke the doors. Obviously, there was damage.  And certainly, people were not, and in his participation, treating the officers with respect and love.

There's no direct evidence in those videos that he helped law enforcement.  He pushed with the crowd to get closer to the police line.  He egged the rioters on at various times, you know, more patriots to the front, fresh troops to continue the fight to get in.  But I would simply -- and certainly, there's recordings of this violence.  And statements like there were about a million people, these 45 cops cannot hold them back, he recognized the battle the police were engaged in with overwhelming odds against them, but they kept at it.

Now, the defendant did plead guilty.  He has not equivocated about knowing he was not authorized to be on the Capitol grounds or in the Capitol or that his actions interfered with law enforcement in their effort to carry out their official duties of keeping the rioters out so the certification of the

electoral vote of the Electoral College could be verified.  He
cooperated with a statement to the U.S. House Select Committee
and, evidently, the FBI.

He does provide what to some degree is unsworn testimony in
Dr. Romanoff's report about the events and his roles and
describing his helping a protestor and the police officer.

And I will accept -- it's hard to tell from the videos
whether that actually happened, frankly, but I will accept that
he did help an officer.  But you know, that does not lessen or
vitiate the harm that he did that day to the officers and to the
country.

To contrast, the statements that you made at the time that
are preserved on the video encouraging the rioters to gain
unauthorized access to the Capitol against presenting yourself
as only recording a historic event or aiding others, which you
evidently did in your Facebook account in other instances.  And
as Dr. Romanoff stated, the actual videos are probably a better
recorder of the -- reflecting on what actually happened.

In terms of parity, this is very difficult to do in these
cases.  And I, frankly, have looked -- I've looked at what other
judges have done, but I've tried to keep a chart, frankly, of
what I have done so that I am consistent, at least with myself.

This is a felony.  Frankly, there's not many sentences
under the statute in general, let alone with me, but I think
that certainly a jail sentence is not out of line with what, you

1    know, others have done and the other sentence.  I did not with

2    Mr. Ryals accept -- allow him to have a deduction for accepting

3    of responsibility, because he ultimately didn't.  He lied about

4    what he did.

5         I don't see Mr. Cantwell in the same position.  He's tried

6    to mitigate or minimize some of his conduct, but he has accepted

7    responsibility for what's on the videos, what he did and what he

8    said.

9         I had stated last time, and the prosecutor has repeated it,

10   but I think it bears repeating again, that violence is an

11   unacceptable way to resolve political differences, that there

12   are lawful means available in a democracy which is very fragile.

13   A democracy, if you want to change it or you want to challenge

14   actions that you disagree with, they just don't include a

15   violent insurrection.

16        Your presence, your actions of joining others basically in

17   an insurrection, which is what it was, was inexcusable, an

18   inexcusable attack on our democracy and what has been the

19   hallmark of our democracy, which is the peaceful transfer of

20   power according to the Constitution.  And it also is a

21   disrespect of the rule of law which governs civilized societies.

22        I also have to say that although your experience in the

23   military was obviously a very negative one, you do take an oath

24   as a part of the military to uphold the Constitution, and you

25   most certainly forgot it on January 6.

1    I am concerned that you don't fully recognize the gravity

2    of your actions on January 6 and how you aided the violence of

3    others.  In other words, you didn't do it yourself, but your

4    actions allowed them to involve themselves in the violence.  To

5    some degree, you're trying to minimize the extent of your role.

6    But you encouraged and celebrated the violence that they were

7    involved with.  If you look at your face in these videos, not

8    just what you said or your actions, but you just look at your

9    expression on your face, and this lack of appreciation, although

10   you've had some time to think about it, does give me some pause

11   about whether or not you would be deterred in the future.

12   And I hope during the period of time, because I am going to

13   give you a jail sentence, you will give some further thought to

14   this.

15   Now, the factors, the key ones, there's a whole series of

16   them in 3553(a).  Just punishment, serious offense, deterrence

17   to you, others, they're certainly the primary goal.  It's my

18   hope that my sentence sends a message to deter you and others

19   from ever engaging in this type of destructive behavior in the

20   future, and that you admit and recognize that you live in a

21   country with incomparable freedoms which are protected by the

22   rule of law.  Eliminate the rule of law, and you jeopardize

23   those freedoms.  You should appreciate what an extraordinary

24   country you live in with a vibrant democracy.  You're lucky to

25   live in a democracy, as opposed to other countries ruled by

1    authoritarians.

2          So in terms of the sentence, pursuant to the Sentencing

3    Reform Act of 1984 and in consideration of the provisions of

4    18 U.S.C. 3553, it is the judgment of the Court that you, Lewis

5    Easton Cantwell, are hereby committed to the custody of the

6    Bureau of Prisons for five months on Count 1.  You are further

7    sentenced to serve a term of 36, or three years, supervised

8    release as to Count 1.

9          In addition, you are ordered to pay a special assessment of

10   $100 in accordance with 18 U.S.C. Section 3013.

11         While on supervision, you shall abide by the following

12   mandatory conditions, as well as the standard conditions of

13   supervision, which are imposed to establish the basic

14   expectations for your conduct while on supervision.

15         The mandatory conditions include:  You must not commit

16   another federal, state, or local crime.  You must not unlawfully

17   possess a controlled substance.  You must refrain from any

18   unlawful use of a controlled substance.  You must submit to one

19   drug test within 15 days of placement on supervision and at

20   least two periodic drug tests thereafter as determined by the

21   Court.  You must make restitution in accordance with 18 U.S.C.

22   Sections 3663 and 3663(A), capital A, or other statutes

23   authorizing a sentence of restitution.  And you must cooperate

24   in the collection of DNA as directed by the Probation Office.

25         You will also comply with the following special conditions:

1    Financial information disclosure.  You must provide the

2    probation officer access to any requested financial information

3    and authorize the release of any financial information.  The

4    Probation Office may share that information with the U.S.

5    Attorney's Office.  And this is until you have paid both the

6    special assessment as well as the restitution.

7         I am going to order a re-entry progress hearing.  So within

8    60 days of release from incarceration or placement into

9    supervision, you will appear before the Court for a re-entry

10   progress hearing.  Prior to the hearing, the probation officer

11   will submit a report summarizing your status and compliance with

12   release conditions.  So it's 60 days after you're in the

13   community.  If you're supervised by a district outside of

14   Washington, D.C., metro area, which is most likely, the U.S.

15   Probation Office in that district will submit the progress

16   report to the Court within 60 days of the commencement of

17   supervision by them.  When I receive the progress report, then

18   I'll determine if your appearance is required.

19        You are ordered to make restitution to the Architect of the

20   Capitol in the amount of -- I believe it's $2,000.

21        Am I correct?

22             MS. SCHESNOL:  That's correct, Your Honor.

23             THE COURT:  Let me get my notes here.

24        The Court determines that -- I've decided you don't have

25   the ability to pay interest and, therefore, waive any interest

1    or any penalties that may accrue on the balances.  The

2    restitution payments need to be paid to the Clerk of the Court

3    of the District Court here in D.C.  They'll disburse it to the

4    victim, which is the Architect of the Capitol, and there's an

5    address, et cetera.

6         In terms of your restitution obligation, since you are

7    going to be locked up for a period of time, I will put in --

8    once you're released, do you have some sense of how much -- I'll

9    put a schedule of how much you can pay monthly.

10             THE DEFENDANT:  I will lose my job by going to jail.

11   So I --

12             THE COURT:  I'm talking about after you get out.

13             THE DEFENDANT:  I don't even know how I'll get another

14   job.  So I have no clue on any of that yet.  I couldn't even

15   possibly --

16             THE COURT:  Okay.  I will put in --

17             THE DEFENDANT:  $50 a month.

18             THE COURT:  Okay.  You must pay the balance of any

19   restitution owed at a rate of not less than $50 each month

20   starting 60 days after your release.

21        If there are issues about paying it, you should talk to

22   Probation, because they can come back to the Court about making

23   adjustments to that.

24        The financial obligations are immediately payable to the

25   Clerk of the Court for the U.S. District Court.  Within 30 days

1    of any change of address, you have to notify the Clerk of the

2    Court of the change until the financial obligation is paid in

3    full.

4         The Probation Office shall release the presentence

5    investigation report to all appropriate agencies, which includes

6    the U.S. Probation Office in the approved district of residence,

7    in order to execute the sentence of the court.

8         Treatment agencies shall return the presentence report to

9    the Probation Office on the defendant's completion or

10   termination from treatment.

11        In terms of appeal, pursuant to 18 U.S.C. 3742, I believe

12   you have a right to appeal the sentence imposed by the Court if

13   it's longer than the statutory maximum, which it's not.  If you

14   choose to appeal, you have to file within 14 days.

15        In terms of any -- 28 U.S.C. 2255, you also have the right

16   to challenge the conviction entered or sentence imposed if new

17   and currently unavailable information becomes available to you

18   or on a claim that you received ineffective assistance of

19   counsel in entering the plea or in connection with the

20   sentencing.  If you're unable to afford the cost of an appeal,

21   you can request permission from the Court to file it without

22   cost to you.  You can also ask to have counsel appointed to

23   represent you.

24        I will allow you to self-report.  So you will remain in the

25   community until that occurs.  You'll then get a notice of where

1    to go.  I will set the time in the new year so you can spend the

2    holidays with your family and making plans for what you're going

3    to do when you get out.  So I will indicate that you cannot be

4    required to report prior to January 13th.

5          Now, you are required to be in the community, and I expect

6    you to follow through with your conditions that you have now.

7    If you don't, I'm going to yank you back, and you're off to

8    jail.  You don't get to wait.  So you need to pay attention to

9    the requirements.  So you can self-report, and it's not before

10   January 13th of 2023.

11         Now, there's a final notice pursuant to D.C. Circuit

12   opinion, *Hunter*, that was decided back in 2016.  If there's any

13   objections or something else that needs to be brought to my

14   attention that we have not already discussed, this is the time

15   to do so.

16         Anything from Probation?

17               PROBATION OFFICER:  Nothing at this time, Your Honor.

18   Thank you.

19               THE COURT:  All right.  Anything from the government?

20               MS. SCHESNOL:  Your Honor, the government moves to

21   dismiss the outstanding counts in the indictment.

22               THE COURT:  All right.  And I believe -- I think there

23   are, what, three counts?

24               MS. SCHESNOL:  I believe there are five counts, and

25   Mr. Cantwell pled guilty to Count 1.  So Counts 2 through 5, we

1    move for their dismissal.

2           THE COURT:  All right.  Let's see.  Any recommendation

3    about where he wants to go?  They usually try and place you near

4    where you live anyway, but I'm perfectly willing to recommend a

5    place if you want.

6           MR. COCIS:  Your Honor, Mr. Cantwell lives in North

7    Carolina, and he mentions that there's a prison called Craggy.

8           THE COURT:  I will ask -- Probation, I'm sure, can

9    tell me what it is in North Carolina.  I'll recommend it.  It

10    doesn't necessarily mean he's going to be there, but they do

11    make an effort to do that.

12       So you're going to be out in the community until you're

13    indicated to self-report.  What you need to do, as I said, you

14    mess up, I'm putting you in jail, and you will start your

15    sentence.  I'm not going to look at any excuses.  You've been in

16    the system long enough.  You had some earlier touches with the

17    infractions, as well as -- although traffic infractions, still

18    some criminal justice contact.  So no excuses on your part.

19    Okay?  You've got to follow through with what you're expected to

20    do.

21           PROBATION OFFICER:  Your Honor, it's spelled Craggy,

22    C-r-a-g-g-y, Correctional Center in Asheville, North Carolina.

23           THE COURT:  I'm sorry.  Where in North Carolina?

24           PROBATION OFFICER:  Asheville.

25           THE COURT:  Oh, Asheville?  Okay.  All right.

1          If there's nothing else, then the parties are excused.   And

2     I don't want to see you back in here on any kind of trouble.

3               THE DEFENDANT:   Thank you, Your Honor.

4          (Proceedings adjourned at 4:18 p.m.)

```
 1                CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Sara A. Wick, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7

 8    /s/ Sara A. Wick_____          January 20, 2023____

 9    SIGNATURE OF COURT REPORTER       DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```